UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PARRISH JEAN MOORE,<br><br>        Plaintiff,<br><br>  v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:14-cv-01581 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF PARRISH JEAN MOORE |

Plaintiff Parrish Jean Moore asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in finding her mental impairments did not satisfy a Listing, and in rejecting the opinion of an examining physician. Because the ALJ applied the proper legal standards, the administrative decision is **AFFIRMED**.

**BACKGROUND**

On January 28, 2011, Plaintiff filed his applications for benefits, in which he alleged disability beginning January 2, 2001. (Doc. 16-3 at 3) The Social Security Administration denied the applications at the initial level on October 25, 2011, and upon reconsideration on March 9, 2012. (*Id.*; Doc. 16-5 at 2-6, 10-14) Plaintiff requested a hearing, and testified before an ALJ on March 22, 2013. (*Id.* at 13, 30) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on June 26, 2013. (*Id.* at 13-23) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on August 20, 2014. (*Id.* at 2-4)

Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

///

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.     Relevant Medical Evidence**

On February 3, 2011, Plaintiff visited the emergency room Community Regional Medical Center, complaining of chronic back pain. (Doc. 16-8 at 3) Plaintiff reported she had the pain for about 20 years, but her pain had increased. (*Id.*) She described the pain has dull, and said it was exacerbated by movement. (*Id.*) Upon examination, Plaintiff had negative straight-leg raising tests and full range of motion in her arms and legs. (*Id.* at 4) X-rays of Plaintiff's lumbar spine showed "no evidence spondylysis or spondylolisthesis." (*Id.* at 5) In addition, Dr. Tarau found "no significant narrowing of the disc spaces." (*Id.*) However, Dr. Tarau determined Plaintiff had "prominent osteophytes arising from the superior endplate of L3, inferior endplate of L2, superior endplate of T12 and T11." (*Id.*)

Dr. Tomas Rios performed a comprehensive internal medicine evaluation on June 3, 2011. (Doc. 16-8 at 6-10) Plaintiff reported she had "chronic back problems" after she was stabbed in the back. (*Id.* at 6) Dr. Rios noted the pain described by Plaintiff was "most pronounced around the right paralumbar region," and she had "radiating numbness to the right gluteal region down to her toes." (*Id.*) In addition, Plaintiff reported she had "chronic knee pain," after a fall during which she "twisted her right knee 10 years ago." (*Id.*) Further, Plaintiff had "a self diagnosis of carpal tunnel syndrome" and "describe[d] pain and numbness" in her wrists and first three fingers on each hand, which she said was occasionally severe enough to wake her up at night. (*Id.* at 6-7) Plaintiff reported she lived with a friend and was independent in activities of daily living, though she did not drive. (*Id.* at 7)

Dr. Rios noted Plaintiff "move[d] about in the room with ease," without a gait altercation. (Doc. 16-8 at 7)  He observed that Plaintiff had "antalgia of the hands," as well as "positive Tinel's signs" in both wrists.  (*Id.* at 7, 9) In addition, Dr. Rios found Plaintiff's "[f]ine and gross finger manipulations remain[ed] preserved with adequate grip strength." (*Id.* at 9)  Dr. Rios opined that Plaintiff was able to lift and carry "20 pounds occasionally and 10 pounds frequently." (*Id.*)  Dr. Rios concluded Plaintiff was "limited on account of the bilateral carpal tunnel syndrome," and concluded she was "capable of performing frequent reaching and handling, and occasional feeling and fingering." (*Id.*)  Further, Dr. Rios believed Plaintiff had postural limitations due to the pain in her lower back and right knee, and he opined Plaintiff could occasionally climb, kneel, crouch, and crawl, and frequently balance and stoop.  (*Id.*)

Dr. Mary Lewis conducted a comprehensive psychiatrist evaluation on June 12, 2011.  (Doc. 16-8 at 11)  Plaintiff reported she was unable to work due to pay in her back, which she described as an "eight" on "a scale of 1-10." (*Id.* at 11)  Plaintiff said she "attempt[ed] to relieve the pain by taking Tylenol," but the pain "stopped [her] from doing anything." (*Id.*)  Plaintiff told Dr. Lewis she had a history of using marijuana from the ages of 16 to 40 and "smoking crack cocaine at the age of 18 through 42."  (*Id.* at 12)  She told Dr. Lewis that she had not worked for fifteen years, and was last employed as a food server for four months. (*Id.*)  Plaintiff reported she stopped working because she "didn't have transportation," but also said she was "not willing to work in any position, [and] not actively seeking employment." (*Id.*)

Dr. Lewis noted Plaintiff entered the room walking with a cane, and she appeared "older than her stated age." (Doc. 16-8 at 12)  Dr. Lewis found Plaintiff's thoughts were linear, logical, coherent, and goal directed." (*Id.* at 13)  She determined Plaintiff was "not significantly impaired" with her "global capacity to act purposefully, to think rationally, and to deal effectively with her environment." (*Id.*)  In addition, Dr. Lewis opined Plaintiff's recent memory recall, attention, and concentration were "satisfactory" based upon her "ability to successfully complete" forward recall of three numbers, backward recall of the three numbers, and remember "three items after five minutes." (*Id.* at 14)  Plaintiff was also able to complete a three-step command and "successfully count by 2s to 20 and back to zero." (*Id.*)  Dr. Lewis observed:

> The claimant's limitations appear to be primarily due to reported medical concerns. When asked her reason for applying for SSI benefits, she did not report any psychological distress and did not exhibit symptoms consistent with a major mental disorder. From a mental health perspective, the claimant appears to be able to function adequately.

(*Id.* at 15) Dr. Lewis gave Plaintiff a GAF score of 66[1], and concluded Plaintiff was "not significantly impaired" with her ability to understand and remember either very short and simple instructions or detailed instructions. (*Id.*) According to Dr. Lewis, Plaintiff was "not significantly impaired" with her ability to maintain attention and concentration, perform daily activities, deal with changes, and "complete a normal workday and workweek without interruptions at a consistent pace." (*Id.* at 15-16)

   On October 13, 2011, Dr. Antonio Medina reviewed the record and completed a physical residual functional capacity assessment. (Doc. 16-8 at 17-25) Dr. Medina noted there was "[n]o evidence of any atrophy on either thenar eminences to suggest carpal tunnel compression" at the consultative examination, and Plaintiff's motor strength was 5/5. (*Id.* at 17) Dr. Medina also found "[]no evidence of any severe disabling findings on exam of the lumbar spine, knees and hands." (*Id.* at 18) He found Plaintiff was able to lift and carry 25 pounds frequently and 50 pounds occasionally, sit about six hours in an eight-hour day, and stand about six hours in an eight-hour day. (*Id.* at 19) In addition, he opined Plaintiff was able to occasionally climb ramps and stairs, stoop, and crouch; frequently balance, kneel, and crawl; but never climb ladders, ropes, or scaffolds. (*Id.* at 20) Dr. Medina concluded Plaintiff did not establish any manipulative, visual, communicative, or environmental limitations. (*Id.* at 21-22) Dr. Medina explained that his opinion differed from Dr. Rios, because the opinion by Dr. Rios appeared to be "based on [Plaintiff's] subjective limitations with no objective evidence to support the allged [sic] limitations." (*Id.* at 24)

   Dr. Barry Rudnick completed a case analysis on October 17, 2011. He noted Plaintiff reported she "uses alcohol and has a history of crack cocaine abuse ending in 2010." (Doc. 16-8 at 26) According to Dr. Rudnick, Plaintiff had "a medically determinable nonsevere mental impairment" of

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*.

"alcohol abuse; history of polysubstance abuse." (*Id.* at 26, 35) Dr. Rudnick noted that Plaintiff did not have any treatment for a mental impairment, and that Dr. Lewis found "[n]o significant functional limitations." (*Id.* at 26) Dr. Rudnick concluded Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 26, 37) Further, Dr. Rudnick found Plaintiff did not have any episodes of decompensation of extended duration. (*Id.*)

In November 2011, Plaintiff visited Clinica Sierra Vista to establish care. (Doc. 16-8 at 56) Plaintiff reported she had suffered from depression and trichotillomania since she was six years old, and her energy and ability to concentrate had decreased. (*Id.* at 54) In addition, Plaintiff said she had pain in her knees and back, and x-rays were ordered. (*Id.* at 51-56) Dr. Robert Port reviewed the images, and found "[m]ild hypertrophic changes at T11-T12 and L2-L3." (*Id.* at 51) The images of Plaintiff's right knee showed "[p]robable joint effusion," and "no significant arthritic changes." (*Id.* at 53) In her left knee, there were was "[m]inimal joint line spurring on the medial side." (*Id.* at 52)

In January 2012, Plaintiff returned to Clinica Sierra Vista for follow-up appointments and to receive her flu shot. (Doc. 176-8 at 45-47) Dr. Sarah Morgan observed that Plaintiff appeared tearful, depressed, and anxious. (*Id.* at 45) She found Plaintiff's memory and thought process were intact. (*Id.*) Further, Dr. Morgan opined that Plaintiff's concentration, judgment, insight, and impulse control were "fair." (*Id.*) She diagnosed Plaintiff with Trichotillomania and Major Depressive Disorder, Moderate, Recurrent. (*Id.*) Dr. Morgan gave Plaintiff a GAF score of 50[2] on January 24, 2012. (*Id.*)

In February 2012, Dr. Morgan noted Plaintiff was taking her medication as prescribed, and did not report any side effects. (Doc. 16-8 at 44) Dr. Morgan observed that Plaintiff was "very guarded" and exhibited a dysphoric mood. (*Id.*) Plaintiff reported she did not have any suicidal or homicidal ideations. (*Id.*) Dr. Morgan concluded Plaintiff's concentration and insight remained fair, and her memory was intact. (*Id.*)

Dr. Ian Ocrant reviewed the record related to Plaintiff's physical impairments in March 2012

---

[2] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*. at 34.

and noted the documents did "not show any worsening of condition." (Doc. 16-8 at 58) He affirmed the assessment of Dr. Medina, finding Plaintiff was able to perform medium work with some postural limitations. (*Id.*) Similarly, Dr. Aquino reviewed the record related to Plaintiff's mental impairments, and "agree[d] to affirm [the] initial decision," finding Plaintiff's mental impairments continued to be "non-severe." (*Id.*)

In May 2012, Plaintiff reported she had not been pulling her hair. (Doc. 16-8 at 69) Dr. Morgan noted that Plaintiff's concentration and insight were fair, and her thought process was intact. (*Id.*) Plaintiff failed to keep her appointments in June 2012. (Doc. 16-8 at 66-67). In July, Plaintiff reported she had insomnia, crying episodes, and her irritability and anger had increased. (*Id.* at 68) Because Plaintiff believed this increase could be due to anger at her roommate, Dr. Morgan "[e]ncouraged [her] to get out & do things." (*Id.*)

Plaintiff went to the hospital in August 2012, complaining of pain in her hands. Dr. Jeffrey Cochiolo ordered x-rays and found "[m]inimal narrowing of the DIP joints with minimal marginal osteophytosis" in her left hand. (Doc. 16-9 at 50) Dr. Cochiolo believed the results were "consistent with very mild early osteoarthritis." (*Id.*) He concluded Plaintiff did not have any degenerative changes in her right hand. (*Id.*)

In September 2012, Plaintiff reported she continued to have difficulty sleeping and have pain. (Doc. 16-8 at 64; Doc. 16-9 at 55) However, Plaintiff reported she was feeling "OK," and she had no suicidal or homicidal ideations. (Doc. 16-8 at 64) Dr. Christoper Nerantzinis determined that Plaintiff's hand grip was "loose but 5/5 strength." (Doc. 16-9 at 55, 56)

On December 16, 2012, Plaintiff went to the emergency room at Community Medical Center, reporting her depression had increased during the week and she wanted "to cut her wrist." (Doc. 16-9 at 78) Dr. Rais Vohra noted Plaintiff also described "anhedonia, insomnia, hypersomnia, appetite changes, fatigue, psychomotor retardation, feelings of worthlessness, attention impairment, euphoric mood and poor judgment." (*Id.* at 74) Plaintiff was placed on a 5150 hold, and referred "to inpatient psych for treatment and stabilization." (*Id.* at 79) Approximately three hours later, Plaintiff reported she no longer had plans to commit suicide and did not contemplate harming herself or others. (*Id.* at 74) Plaintiff was discharged the same afternoon to Exodus Recovery Center, where she remained for

7

one night. (*Id.* at 73; Doc. 16-10 at 16)

On December 27, 2012, Plaintiff told Dr. Morgan about going to the emergency room, and said she no longer had suicidal ideations. (Doc. 16-8 at 63) Dr. Morgan increased Plaintiff's prescription for Gabapentin to address Plaintiff's anxiety symptoms. (*Id.*) Dr. Morgan noted Plaintiff "need[ed] a higher level of care," and referred Plaintiff to a substance abuse counselor and Exodus Recovery Center. (*Id.*)

Plaintiff went to the hospital again on January 29, 2013, again reporting she had "thoughts of slitting her wrist or overdosing on her pills." (Doc. 16-10 at 18) Plaintiff "was admitted as being a danger to self," and was "[p]ositive for altered mental status, depression and suicidal ideas." (*Id.* at 21) She was discharged on January 31, 2013. (*Id.*) Plaintiff's medication was changed, and February she reported that it was "helping more of her symptoms." (Doc. 16-8 at 62)

Plaintiff went to the hospital a third time on March 18, 2013, and described "severe depression and auditory hallucinations telling her to kill herself." (Doc. 16-10 at 23) She attributed the increase in her depression to the fact that her stepson was convicted of murdering his cellmate and was facing the death penalty. (*Id.*) Dr. Manolito Castillo increased Plaintiff's prescription for Prozac and "added Abilify 2 mg every morning." (*Id.*) Plaintiff was discharged from the hospital on March 21, 2013. (*Id.*)

**B.      Administrative Hearing Testimony**[3]

Plaintiff testified before the ALJ at a hearing on March 22, 2013. (Doc. 16-3 at 30) Plaintiff reported she had not worked since 1988. (*Id.* at 33) She believed she was unable to work due to depression, anxiety, and arthritis. (*Id.* at 34.) Plaintiff said she went to a family doctor at Clinica Sierra Vista for treatment, and she attended group therapy for her anxiety and depression. (*Id.* at 38)

Vocational expert Stephen Schmidt also testified at the hearing. The ALJ asked the VE to consider a hypothetical individual who had limitations similar to those assessed by Dr. Rios. (Doc. 16-3 at 55). Specifically, the VE considered an individual who "had a maximum standing and walking capacity up to six hours; maximum sitting capacity up to six hours; [and did] not require an assistive

---

[3] The ALJ found Plaintiff's subjective complaints lacked credibility, and Plaintiff does not challenge this finding, or the ALJ's reasons given to explain the conclusion. Accordingly, her testimony is summarized only briefly to provide a context for her alleged impairments and the ALJ's findings.

device." (*Id.*) The hypothetical person was also able to "lift 20 pounds occasionally and 10 pounds frequently," and was "capable of frequent reaching and handling and occasional feeling and finger." (*Id.*) Further, the ALJ said the "individual [was] capable of performing occasional … climbing, kneeling, crouch, crawling, and frequent balancing and stooping." (*Id.*) The VE believed there were not any jobs in the national economy an individual with these limitations could perform "based upon the manipulative limitations." (*Id.*) However, if the person did not have any manipulative limitations, the VE believed the person would be able to perform light work as a cashier, DOT 211.462-010; fast food worker, DOT 311.472-010; and cleaner, DOT 323.687-014.[4] (*Id.*)

Next the ALJ asked the VE to consider an individual with the same physical limitations, but who was also "limited to simple, repetitive tasks." (Doc. 16-3 at 57) The VE opined such a person would be able to perform each of the jobs previously identified. (*Id.*)

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the alleged disability date of January 28, 2011. (Doc. 16-3 at 15) Second, the ALJ found Plaintiff "has the following severe impairments: back and knee pain likely due to osteoarthritis, obesity, major depressive disorder, posttraumatic stress disorder (PTSD) and drug abuse." (*Id.*) At step three, the ALJ opined these impairments did not meet or medically equal a listed impairment, including Listings 12.04, 12.06, and 12.09. (*Id.* at 15-17) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). She is able to lift or carry 10 lbs. frequently and 20 lbs. occasionally. She can sit, stand and walk about 6 hours in an 8-hour workday, occasionally climb, kneel, crouch and crawl, and frequently balance and stoop. [Citation] There is no credible evidence supporting any manipulative limitations. The claimant is limited to simple repetitive tasks.

(*Id.* at 17, citation omitted) With this residual functional capacity, the ALJ found Plaintiff retained the ability to perform "jobs that exist in significant numbers in the national economy." (*Id.* at 22) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 23)

---

[4] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

# DISCUSSION AND ANALYSIS

Plaintiff asserts the ALJ failed "to sufficiently determine whether [her] diagnosed major depressive disorder meets or equals a listed impairment." (Doc. 21 at 8, emphasis omitted)  In addition, Plaintiff contends the ALJ "erred by failing to accord proper weight" to the opinion of Dr. Rios.  (*Id.* at 10, emphasis omitted)  On the other hand, Defendant argues any error in assessing Plaintiff's mental impairments was harmless, and the ALJ's findings related to Plaintiff's physical limitations are supported by substantial evidence in the record.  (Doc. 22 at 4-8)

## A.     The ALJ's Step Three Findings

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'"  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original).  At step three of the sequential evaluation, the claimant bears the burden of demonstrating her impairments equal a listed impairment.  *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d).  "If the impairment meets or equals a listed impairment, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step."  *Bowen*, 482 U.S. at 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

Here, Plaintiff asserts the ALJ erred in finding she did not satisfy the "paragraph B" criteria of Listings 12.04, 12.06 and 12.09.  (Doc. 21 at 8-9) The "paragraph B" criteria set forth in 20 C.F.R., Pt. 404, Subpart P, App. 1 are used to evaluate the mental impairments of a claimant, and include: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

Considering "paragraph B" criteria, the ALJ concluded Plaintiff had "mild restriction" in activities of daily living and "mild difficulties" with social functioning and concentration, persistence, or pace. (Doc. 16-3 at 15)  In addition, the ALJ noted the "evidence shows two hospital admissions for self-reported suicidal ideation in December 2012 and January 2013 . . . [that] could be episodes of decompensation." (*Id.*)  The ALJ concluded: "Because the claimant's mental impairment does not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated episodes of

10

decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (*Id.*) Plaintiff argues the ALJ erred in finding she did not suffer a third episode of decompensation because the ALJ did not discuss the third time Plaintiff went to the hospital in March 2013. (Doc. 21 at 9) According to Plaintiff, the failure "to consider evidence that potentially establishes meeting a listed impairment constitutes legal error and warrants a remand." (*Id.*)

Under the Listings, episodes of decompensation are defined as "exacerbations or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relations, or maintaining concentration, persistence, or pace." 20 C.F.R., Part 404, Subpart P, App. 1, § 12.00(C)(4). Further, the Regulations explain:

> Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

*Id.* Because an episode of decompensation may be inferred from a hospitalization, the fact that Plaintiff was admitted for suicidal ideations in March 2012 could be considered a third episode of decompensation.

Significantly, however, Plaintiff fails to acknowledge that "paragraph B" requires her to not only identify repeated episodes of decompensation, but also that each episode be of "extended duration." *See* 20 C.F.R., Pt. 404, Subpart P, App. 1, §§ 12.04(B), 12.06(B). An episode of decompensation is of "extended duration" when it "last[s] for at least 2 weeks." *Id.*, §12.00(C)(4). The evidence related to her third hospitalization shows Plaintiff remained for three days. (*See* Doc. 16-10 at 23) Plaintiff does not identify any evidence supporting a conclusion that any of her episodes of decompensation—including the third not discussed by the ALJ— were of "extended duration," as required by "paragraph B." To the contrary, Plaintiff's first hospitalization lasted for less than six hours. (*See* Doc. 16-9 at 73) She was discharged in March 2013 after three days. (Doc. 16-10 at 23)

Moreover, Plaintiff does not challenge the ALJ's findings related to the other "paragraph B" considerations--or the conclusions that Plaintiff had mild restrictions in activities of daily living; mild

difficulties with social functioning; and mild difficulties with concentration, persistence, or pace.[5] (*See* Doc. 21 at 8-9) To satisfy "paragraph B" of the Listings related to mental disorders, a claimant has the burden to show:

> ***[A]t least two of the following***:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

*See e.g.,* 20 C.F.R., Pt. 404, Subpart P, App. 1, §§ 12.04(B), 12.06(B) (emphasis added). Because Plaintiff had only "mild" restrictions and difficulties, she fails to carry her burden to show her mental impairments satisfy the Listings. *See Sullivan,* 493 U.S. at 530 ("For a claimant to show that [her] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.")

Accordingly, any failure of the ALJ to discuss the third hospitalization at step three was harmless, because Plaintiff fails to satisfy the remaining criteria for paragraph B under the Listings.

## B.   Evaluation of Dr. Rios' Opinion

In this circuit, courts distinguish three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The opinion of a physician may be rejected with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). When there is conflicting medical evidence, "it is the ALJ's role to determine

---

[5] The Ninth Circuit instructs that the Court will "review only issues which are argued specifically and distinctly." *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Accordingly, any argument regarding an error in the ALJ's conclusions related to the remaining "paragraph B" requirements—including Plaintiff's ability to perform daily activities, maintain social functioning; and maintain concentration, persistence, or pace—is **WAIVED.**

credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff asserts the ALJ erred by finding she did not have any manipulative limitations, which were identified by Dr. Rios. (Doc. 21 at 9) Specifically, Dr. Rios determined Plaintiff was "capable of performing frequent reaching and handling, and occasional feeling and fingering." (Doc. 16-8 at 9) However, the ALJ rejected these limitations, finding there was "no credible evidence supporting any manipulative limitations." (Doc. 16-3 at 17) The ALJ noted Plaintiff had self-diagnosed her carpal tunnel syndrome, and Drs. Medina and Ocrant opined the evidence did not support manipulative limitations. (*Id.* at 18-19)

Importantly, the Ninth Circuit has determined that the opinion of a physician may be rejected when it is "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010). When an ALJ believes a physician's opinion is unsupported by the objective medical evidence, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

The ALJ noted Dr. Rios indicated Plaintiff had "antalgia of the hands" and "some abnormal findings" involving her wrists, where she had positive Tinel's signs. (Doc. 16-3 at 18; Doc. 16-8 at 7, 9) However, the ALJ noted also that treatment notes indicated Plaintiff's "[h]andgrips were loose, but 5 out of 5 strength." (Doc. 16-3 at 18) Thus, the ALJ met the obligation to identify the evidence that undermined the opinion of Dr. Rios. Further, the ALJ's determination was supported by substantial evidence in the record, including the opinions of Drs. Medina and Ocrant who opined Plaintiff did not have any manipulative limitations despite her assertion that she suffered from carpel tunnel

syndrome.[6]

Regardless, any error from rejecting the opinion of Dr. Rios is also harmless, because Plaintiff would be able to perform work identified by the ALJ, even if the manipulative limitations were adopted. In the *Dictionary of Occupational Titles*, the physical demands for "cleaner" include reaching and handling "frequently," or "up to 2/3 of the time." DOT 323.687-014. Fingering may be performed "occasionally," and feeling is "not present" because the activity "does not exist" with the position. *Id.* Consequently, the physical demands for "cleaner" do not exceed the manipulative abilities assessed by Dr. Rios.[7] According to the VE, there were 43,000 jobs regionally and 375,000 jobs nationally for this position. (Doc. 16-3 at 57) Consequently, although Plaintiff would not be able to perform work as a cashier or fast food worker, the jobs for cleaners are sufficiently numerous. *See, e.g., Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (finding the ALJ "properly concluded that there was a significant number of... jobs in the local area," where the ALJ found "there were between 1,000 and 1,500" regional positions); *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (finding 1,300 regional positions satisfied the "significant number" requirement).

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ applied the proper legal standards in finding Plaintiff's mental impairments did not satisfy the "paragraph B" criteria and in rejecting the manipulative limitations assessed by Dr. Rios. Further, any error by the ALJ in evaluating Plaintiff's manipulative limitations was harmless because the error did not negate the ultimate conclusion that Plaintiff is able to perform work existing in significant numbers in the regional and national economies. *See Batson v. Comm'r of the Soc. Sec. Admin,* 359 F.3d 1190, 1195-97 (9th Cir. 2003) (applying a harmless error standard). Accordingly, the ALJ's determination that Plaintiff is not disabled must be

---

[6] The opinions of non-examining physicians—such as Drs. Medina and Ocrant—are substantial evidence when "consistent with other independent evidence in the record," such as the treatment notes which do not indicate any manipulative limitations or difficulty gripping items. *See* Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

[7] As Plaintiff notes, the VE testified a worker with the manipulative limitations assessed by Dr. Rios would not be able to perform this work. However, the *Dictionary of Occupational Titles* clearly indicates the physical requirements of the position less than the abilities assessed by Dr. Rios. The VE did not acknowledge that his testimony conflicted with these limitations. Because the Ninth Circuit has recognized that the *Dictionary of Occupational Titles* is a "primary source of reliable job information," *Zavalin v. Colving*, 778 F.3d 842, 845-46 (9th Cir. 2015), the Court adopts the limitations identified in the *Dictionary of Occupational Titles.*

1 | upheld by the Court.  *Sanchez*, 812 F.2d at 510.

2 |     Based upon the foregoing, **IT IS HEREBY ORDERED**:

3 |     1.    The decision of the Commissioner of Social Security is **AFFIRMED**; and

4 |     2.    The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Parrish Jean Moore.

**IT IS SO ORDERED.**

Dated:   **December 23, 2015**                    **/s/ Jennifer L. Thurston**
                                                               UNITED STATES MAGISTRATE JUDGE